**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | |
|---|---|
| In re MOHAMMED H. KHAN, ) | Case No. 06-60648-LYN |
| ) | |
| Debtor, ) | Chapter 7 |
| ) | |
| UNITED STATES TRUSTEE, ) | Adversary No. 06-06074 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MOHAMMED H. KAHN, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| ) | |
| ) | |

**MEMORANDUM AND ORDER**

The matter comes before the court on the United States trustee's complaint objecting to the entry of discharge of Mohammed H. Khan ("the Debtor"). The complaint is brought under 11 U.S.C. § 727(a). Judgment shall be entered in favor of the United States trustee. The Debtor's discharge shall be denied.

*I. Jurisdiction*

1

This Court has jurisdiction over this matter. 28 U.S.C. § 1334(a) & 157(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(J). Accordingly, this Court may enter a final order. This memorandum shall constitute the Court's findings of fact and conclusions of law as directed by Fed.R.Civ.P. 52, which is made applicable in this proceeding by Fed. R. Bankr. P. 7052.

## *II. Facts*

During May of 2004 the Debtor's father, Sarwar Khan, purchased an ongoing gas station and convenience store for the Debtor.[1] The Debtor and his father established Jeeva, Inc., in order to purchase the business. The Debtor received all 200 shares of stock in Jeeva, Inc.[2] The Debtor, his father, and another person were named as the only three officers of Jeeva, Inc. The business traded as Speedway #4.

On May 13, 2004, Jeeva, Inc., entered into an Inventory Purchase Agreement by which Jeeva, Inc., purchased the business and inventory of Speedway #4 from Mancho, Inc. The Debtor was the only person who executed the Inventory Purchase Agreement on behalf of Jeeva, Inc.[3]

On June 1, 2004, Jeeva, Inc., entered into a Sublease Agreement by which Jeeva, Inc., sublet the fuel equipment, pumps, canopy, etc., from Mancho, Inc. The Debtor executed the Sublease. It appears that he executed the Sublease Agreement individually, as it contains no indication that he was signing on behalf of Jeeva, Inc.[4] On that same date, Jeeva, Inc., entered

---

[1] The price paid for the business was $100,000.00 payable at the rate of $1,500.00 per month.

[2] See Exhibit #24 of the United States trustee, Deposition of Mohammad H. Kahn, pp. 6-12.

[3] See Exhibit #9 of the United States trustee.

[4] See Exhibit #6 of the United States trustee.

2

into a Lease Agreement with Mancho, Inc., by which Jeeva, Inc., leased the premises, the building and land on which Speedway #4 was located.  The Debtor executed the Lease Agreement on behalf of Jeeva, Inc.  The Debtor also executed the Lease Agreement individually as guarantor.[5]

On May 24, 2004, the Debtor applied, on behalf of Jeeva, Inc., for a Taxpayer Identification Number and Certification from the United States government.  The Debtor was the only person to execute the request.[6]  Also on May 24, 2004, Jeeva, Inc., applied to H.T. Hackney Co. ("Hackney") to purchase cigarettes, candy and groceries on credit.  The Debtor was the only person to execute the application on behalf of Jeeva, Inc.  Additionally, he signed the application as a guarantor.[7]

On September 22, 2004, Jeeva, Inc., entered into a Supply Contract with Pacegro, Inc. (dba Triad Oil Company ("Triad")) for the purchase of gasoline.[8]  The Debtor was the only person who signed the Supply Contract on behalf of Jeeva, Inc.  He signed the Supply Contract as the owner of Jeeva, Inc.[9]  Triad financed the fuels sold to Jeeva, Inc., on credit so that Jeeva, Inc., would own the fuels and could thereby set its own prices.[10]

---

[5] See Exhibit #9 of the United States trustee.

[6] See Exhibit #7 of the United States trustee.

[7] See Exhibit #8 of the United States trustee.

[8] Triad Oil Company is the trade name for Pacegro, Inc.  See Testimony of Cecil Little.  Transcript of Hearing, pp. 24.

[9] See Exhibit #10 of the United States trustee.

[10] Testimony of Cecil Little of Triad Oil.  Transcript of Hearing, pp. 29-31.  Triad paid Exxon for oil delivered to its customers, even before it billed those customers.  See p 35.  In some cases Triad would pay Exxon (by automatic draft from its account) even before it was aware that the customer had ordered the oil.  See pp. 30-37.

From January 20, 2006, to March 18, 2006, Jeeva,, Inc., ordered and received an average of approximately 6,700 gallons of gasoline and diesel fuel per week from Triad. Between March 25 and March 31, Jeeva, Inc., ordered and received three orders totaling 27,000 gallons of gasoline and diesel from Triad.[11] The total invoice cost of the three deliveries is $65,683.66. Of this amount, $52,000.00 has not been paid by Jeeva, Inc.[12] Jeeva, Inc., now owes Triad more than $80,000.00. All of the gasoline and diesel fuel was sold.[13]

From April of 2005 through March of 2006, Jeeva, Inc., ordered an average of $2,425.35 per week in food, notions, candy and cigarettes from Hackney.[14] On March 28, 2006, Jeeva, Inc., ordered $16,055.21 from Hackney and on March 31, 2006, Jeeva, Inc., ordered $9,006.34 worth of goods from Hackney.[15] Jeeva, Inc., never paid for any of these goods. The orders constituted approximately 75% cigarettes, a percentage greater than the usual 50% to 60%.[16]

On May 8, 2006, the Debtor filed a chapter 7 petition initiating the instant bankruptcy case. He filed as "Mohammed Husnain Kahn a/k/a individual & DBA Jeeva, Inc., Speedway #4".[17] He scheduled "all 200 shares of Jeeva Inc" as property of the estate and valued the same

---

[11] See Exhibit #12 of the United States trustee.

[12] Testimony of Cecil Little. Transcript of Hearing, pp. 41-42.

[13] See Exhibit #24 of the United States trustee, Deposition of Mohammad H. Kahn, p. 57-58.

[14] See Exhibit #14 of the United States trustee

[15] See Exhibit #13 of the United States trustee

[16] Testimony of Jim Lynch, Controller of Hackney, Inc., for twenty-one years. Transcript of Hearing, pp. 81-82.

[17] Debtor's Petition.

4

at $00.00[18], but initially did not provide the information required in his Statement of Financial Affairs, Item 18.[19] The Debtor scheduled unsecured debt in the amount of $598,655.15.[20] The Debtor is a co-debtor with Jeeva, Inc., on all of the debt with the exception of one debt in the amount of $298.00.[21] On July 12, 2006, the chapter 7 trustee filed a report of no assets.

On August 10, 2006, the United States trustee filed the instant complaint objecting to the debtor's discharge pursuant to Section 727(a)(2)&(a)(4)[22]. The United States trustee filed an amended complaint alleging that the Debtor's discharge should be denied under Section 727(a)(5).

### *III. Discussion*

The complaint, as amended, is brought under 11 U.S.C. § 727(a)(2),(4)&(5). The facts also warrant consideration under 11 U.S.C. § 727(a)(3).

The burden of proving each of the elements of a cause of action under Section 727 rests on the party objecting to the discharge. Fed. R. Bankr. P. 4005. Also see, In re Mascolo, 505 F.2d 274, 276 (1st Cir.1974); and In re Seablom, 45 B.R. 445, 449 (Bkrtcy.D.N.D.1984). The creditor must carry the burden of persuasion by a preponderance of the evidence. Farouki v. Emirates Bank International, 14 F.3d 244, 250 (4th Cir. 1984). Although the burden may shift to

---

[18] See Debtor's Schedule B, item 13. The Debtor did not originally disclose his ownership interest in Jeeva on his Statement of Financial Affairs, but did subsequently amend the Statement to reflect the ownership interest.

[19] Item 18 requires a debtor to provide a corporation's Taxpayer I.D. No., address, the nature of the business, and the beginning and ending dates of its operation.

[20] See Debtor's Schedule F.

[21] Id.

[22] All references to "Section" are references to the stated section of the United States Bankruptcy Code, codified in Title 11 of the United States Code.

the defendant to provide rebuttal evidence after a plaintiff has established a prima facie case, the ultimate burden or persuasion is on the plaintiff. Id.

Section 727(a)(5) provides that the court shall grant the debtor a discharge, unless the debtor has failed to satisfactorily explained, before the determination of discharge under that Section, any loss of assets or deficiency of assets that could be used to pay the debtor's liabilities. This section is intended to deter those who attempt to abuse the bankruptcy process "by obfuscating the true nature of [their] affairs, and then refusing to provide a credible explanation." In re Johnson, 98 B.R. 359, 366 (Bankr.N.D.Ill.1988) (quoting First Federated Life Insurance v. Martin (In re Martin), 698 F.2d 883, 888 (7th Cir.1983).

Section 727(a)(5) is broad enough to include any unexplained disappearance or shortage of assets. See, Alan N. Resnick & Henry J. Sommer, 6 Collier on Bankruptcy, "Discharge", 727.08 (15th Ed 2007) (Citing Chalik v. Moorefield (In re Chalik), 748 F.2d 616 (11th Cir. 1984). The question whether a debtor has satisfactorily explained the loss of assets is a question of fact. Chalik, 748 F.2d at 619. The element of intent that is necessary under Section 727(a)(2),(3)&(4) is not required under Section 727(a)(5). See Prairie Production Credit Assn v. Suttles (In re Suttles), 819 F.2d 764, 766 (7th Cir.1987). Nof v. Gannon (In re Gannon), 173 B.R. 313 (Bankr. S.D.N.Y. 1994). Also see Alan N. Resnick & Henry J. Sommer, 6 Collier on Bankruptcy, "Discharge", 727.08 (15th Ed 2007).

> Under § 727(a)(5), objecting creditors do not have to prove that the debtor acted knowingly or fraudulently in listing her assets or in with holding any information. *Compare* 11 U.S.C. § 727(a)(4) *with* 11 U.S.C. § 727(a)(5). Rather, all an objecting creditor need do is identify missing assets; once that is done, the debtor must explain in a satisfactory manner the loss of those assets.

In re Ottoson-King, 3 Fed. Appx. 147, 151 (4th Cir. 2001) (Emphasis in original.). In order to

prevail under Section 727(a)(5), the United States trustee must show that there are missing assets, or that there is a deficiency in the value of assets, that could be used to satisfy or partially satisfy the claims of creditors.   The burden then shifts to the Debtor to satisfactorily explain the loss of assets.

Between March 25, 2006 and March 31, 2006, less than six weeks prior to the date that the Debtor filed his petition, Jeeva, Inc., ordered and received 27,000 gallons of gasoline and diesel from Triad.  This average of 13,500 gallons per week was at least twice the normal amount of fuel ordered and received in any two-week period during the previous four months. The delivered invoice cost of the three deliveries is $65,683.66.  Jeeva, Inc., never paid Triad for this fuel.[23]   Jeeva, Inc., also ordered and received more than $25,061.55 worth of food stuffs and cigarettes, approximately ten time Jeeva, Inc.'s, average weekly order.  Jeeva, Inc., sold all of the fuel.[24]  Jeeva, Inc., sold, or otherwise disposed of[25], all of the food stuffs and cigarettes, but has never paid Hackney for them.

> Q:  [United States trustee] :  So somewhere between the deliveries that came before the race week and then right after race week you said your dad sleeved the pumps, or covered them?
>
> A:  [The Debtor]: Yeah.  When I go back after the race it was like maybe three or four days after the race, because I know we still had gas and everything.   My dad just got

---

[23] Testimony of Cecil Little.  Transcript of Hearing, pp.  41-43.

[24] See Exhibit #24 of the United States trustee, Deposition of Mohammad H.  Kahn, pp.  57-58.

[25] Mr.  Little testified that after the fuel was sold, he returned to Speedway #4 and overheard the Debtor's father "talking to a man about coming pay with his pickup truck that afternoon and loading up all the stuff in the store."  Testimony of Cecil Little.  Transcript of Hearing, pp.  43.

7

an order I believe before I left and we had gas and everything.

> Q: Sure. And all the gas got sold?
>
> A: Yeah. By the time I got back there was bags on the pumps, yes.
>
> Q: What happened to the money that was associated with selling all that gasoline?
>
> A: I have no clue.
>
> Q: Who would know?
>
> A: My dad would know. . . . [26]
>
> . . .
>
> Q: [United States trustee]: Would there be any record of where the money went.
>
> A: [The Debtor]: He would know. My dad would know. I mean if there's a record and whatever he did with it, he would know. I mean I never handled the money, I never handled the paperwork or anything.[27]

The race occurred on April 2, 2006.[28] From March 25, 2006, to April 5, 2006, Jeeva, Inc., sold all of the fuel and all of the cigarettes and other goods. The Debtor has failed to account for the monies received from the sale and disposition of goods worth at least $90,745.21 less than six weeks from the date that he filed his petition.

The Debtor's schedules indicate that Jeeva, Inc., no longer possesses either the fuel or the goods, or the proceeds of the sale therefrom. The burden shifts to the Debtor to explain the loss of these assets. The Debtor has been unable to do so.

---

[26] Exhibit #24 of the United States trustee, Deposition of Mohammad H. Kahn, pp. 57-58.

[27] Exhibit #24 of the United States trustee, Deposition of Mohammad H. Kahn, pp. 57-58, l. 12-17.

[28] Statement of Counsel for the Debtor. Transcript of Hearing, p. 62, lines 1-5.

And the Debtor has failed to show extenuating circumstances that would relieve him from the duty of explaining the disposition the proceeds from the sale of fuel and goods. He asserts that his father actually ran Speedway #4, that his father handled the money, that his father was responsible for accounting, that his father would know the location of the money and the corporate books.

But it is the Debtor who is the sole shareholder of Jeeva, Inc. It was the Debtor, and only the Debtor, who executed the Inventory Purchase Agreement, Sublease Agreement, and the Lease Agreement. It was the Debtor, and only the Debtor, who applied for a Taxpayer Identification Number and Certification from the United States government. It was the Debtor, and only the Debtor, who applied to Hackney to purchase cigarettes, candy and groceries on credit. It was the Debtor, and only the Debtor, who entered into a Supply Contract with Triad for the purchase of gasoline.

The Debtor also argues that the large orders are easily explained in that a major stock car race, drawing large crowds, took place locally during the time when the orders were made. This only explains why the Debtor and Jeeva, Inc., were able to sell the fuel and goods; it does not explain what happened to the proceeds from the sale of the fuel and goods.[29]

The Debtor has failed to divulge information to which his creditors are entitled. His discharge must be denied under Section 727(b)(5).

Section 727(a)(3) provides that the court shall grant the debtor a discharge, unless the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded

---

[29] There is evidence that Speedway #4 priced its fuel at five cents below the local market during this week. Testimony of Cecil Little. Transcript of Hearing, pp. 41-42. This may further explain how Speedway #4 was able to sell more than twice as much fuel as normal. Mr. Little indicated that the Debtor would have difficulty making a profit at such a price. P. 42, l. 1-4.

information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

If the nature and extent of the debtor's transactions were such that the others in like circumstances would ordinarily keep financial records, the debtor must show that the existence of unusual circumstances relieve him of his duty to keep them.  6 Collier on Bankruptcy ¶ 727.03[3][b], at 727-33).

If a debtor's debts and those of a corporation owned solely by the debtor are virtually one and the same, then the debtor has an obligation to maintain business records and to forward the same to the trustee upon request.  It is not relevant that the debtor and such a wholly owned corporation are not one and the same entity.

> In many cases, as in this one, substantially all of the debts of the individual partners were those of the partnership. The failure of a partner to keep partnership books and records may preclude a creditor or a trustee from ascertaining the true financial condition of a partner.

Charles Edwards and Associates v. England, 301 F.2d 572, 574 (9th Cir. 1962)[30].  In England, court denied the debtor's discharge because he had failed to maintain adequate partnership records.

In this case, the Debtor scheduled $598,655.15 in unsecured debt.  All but $298.00 of that amount was debt also owed by Jeeva, Inc.  The Debtor had, and has, an obligation to maintain and produce the business records of Jeeva, Inc.   Yet, he simply stated "none" under Item 19 of his Statement of Financial Affairs, which asks for the location of any such records.

---

[30]    Opinions under the Bankruptcy Act of 1898 tend to retain their vitality under the Bankruptcy Code of 1978 unless specifically overruled by subsequent legislation or mandatory authority.

The Debtor denied any knowledge of the location of the records concerning the proceeds of the sales during the end of March

> Q: [United States trustee]: And these little slips are all that you all maintained showing the cash going out?
>
> A: [The Debtor]: Yes, Ma'am, because when you paid out something on the register that would come on your day report and show the total of the pay out, and it would have every paid out when you did the paperwork to see the total.
>
> Q: Sure. And all those paid out records, are they somewhere, so there would be a printout of paid outs?
>
> A: Oh, no. I mean on the day report.
>
> Q: Where are the day reports?
>
> A: I don't know. My dad would know. I would print out the day report and I would rip it off the printer and I would leave it right here on the table and in the morning whoever comes in, I guess my dad, he would take them, and I would just do the same thing every day.[31]

The failure of the Debtor to maintain the corporate books and records of Jeeva, Inc., or to provide the location of any such records, precludes the United States trustee and the chapter 7 trustee from ascertaining the true value of the Jeeva, Inc., stock and the true financial condition of the Debtor. It is impossible to ascertain the value of the Debtor's interest in Jeeva, Inc., without the books and records of Jeeva, Inc.

The records provided by the Debtor to his accountant were not sufficient for the Debtor's

---

[31] Exhibit #24 of the United States trustee, Deposition of Mohammad H. Kahn, pp. 62-63.

accountant to prepare Jeeva, Inc.'s 2006 tax returns.  The Debtor asserted at the trial on this matter that his father controlled the records of Jeeva, Inc., and that his father was in Pakistan. The court granted the Debtor additional time to produce the records necessary to construct that tax return.   He failed to do so.[32]

It is the duty of the Debtor to explain the location of the books and records of Jeeva, Inc. Because he has failed to do so, his discharge must also be denied under Section 727(a)(3).

The United States trustee also brings this complaint under Section 727(a)(2)&(4).[33]  In light of the foregoing discussion, it is unnecessary to consider the complaint under these Sections.

### *IV.  Conclusion*

Judgment shall be granted in favor of the United States trustee.  The debtor shall not be granted a discharge.

---

[32]    See, generally, Transcript of Hearing, p.  1-20.

[33]    Section 727(a)(2) provides that the court shall grant the debtor a discharge, unless the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed (A) property of the debtor, within one year before the date of the filing of the petition; (B) property of the estate, after the date of the filing of the petition. Any transfer of an interest in property, including a transfer of possession, custody or control in the absence of any transfer of title, qualifies as a "transfer" within the meaning of Section 727(a)(2).  In re Golob, 252 B.R. 69 (Bankr.  E.D. Va.  2000).

Section 727(a)(4) provides that the court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently, in or in connection with the case (A) made a false oath or account; (B) presented or used a false claim; (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

In order to be denied a discharge under section 727(a)(4)(A), the defendant must have made a statement under oath which he knew to be false and he must have made the statement willfully, with the intent to defraud.  Williamson v. Fireman's Fund Insurance Company, 828 F.2d 249 (4th Cir. 1987) (citing 4 Collier on Bankruptcy ¶ 727.04[1], at 727-54 to55).  The false oath must be related to a material matter.  Id. Whether the defendant has made a false oath within the meaning of section 727(a)(4)(A) is a matter of fact. Id..

An appropriate judgment shall issue.

Upon entry of this Memorandum, the Clerk shall forward a copy to the United States trustee, and Michael P. Reagan, Esq., counsel for the debtor, and to the chapter 7 trustee.

Entered on this  16th  day of August, 2007.

_____
William E. Anderson
United States Bankruptcy Judge